**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

_____

TREY COCKRELL,

                         Plaintiff,

        **vs.**

Joshua Bowersox, in his individual capacity as a
Brentwood police officer; Nicolas Stanze, in his
individual capacity as a Brentwood police officer;
Lang, in his individual capacity as a Brentwood
police officer; Major Craig Mueler, in his
individual capacity as a Brentwood police officer;
Joseph L. Spiess, in his individual capacity as the
Chief of Police for the Brentwood Police
Department; Matt Karl, in his individual capacity
as a Richmond Heights police officer; Jeffrey
Dulaney, in his individual capacity as a Richmond
Heights police officer; Police Officer Vargas, in
his individual capacity as a Richmond Heights
police officer; Doug Schaeffler, in his individual
capacity as the former Chief of Police for
Richmond Heights Police Department; Jeffrey
DeVorss, in his individual capacity as a Clayton
Sergeant; Kevin Murphy, in his individual
capacity as former Chief of Police for the Clayton
Police Department; Jon Belmar, in his individual
capacity as the former Police Chief of the Saint
Louis County Police Department; Colonel
Timothy E. Fitch, in his individual capacity as
former Police Chief of the Saint Louis County
Police Department; the City of Brentwood; City
of Brentwood Mayor Chris Thorton; the City of
Richmond Heights; City of Richmond Heights
Mayor Jim Thompson; the City of Clayton; City
of Clayton Mayor Harold Sangler; the Saint Louis
County Police Department, Saint Louis County
Police Academy(s); and Saint Louis County.

                    Defendants.

_____

Case No.

**Complaint**

*Jury Trial Demanded Under*
*Fed. R. Civ. P. 38(b)*

1

For his Complaint, Plaintiff Trey Cockrell, by and through his attorneys, states and alleges as follows:

## **Introduction**

1.    This cause of action arises out of Trey Cockrell's November 20, 2018 excessive force, assault and personal injury by serious gunshots, which Plaintiff sustained at approximately 11:42 p.m., at 8700 block of Eager Road, Saint Louis County, Missouri.

2.    Plaintiff alleges the Saint Louis County Police Department ("SLCPD"), Saint Louis County Police Academy, County of Saint Louis, former Chief of Police Jon Belmar and Former Chief of Police Timothy E. Fitch failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force and/or deadly force, including those officers repeatedly accused of such acts.  Plaintiff alleges these defendants had a duty, but failed to implement and/or enforce policies, practices  and procedures for the SLCPD and its municipal police departments within the county, that respected Plaintiff's constitutional rights to assistance and protection. Plaintiff alleges a failure to adequately supervise and discipline all defendant Police Officers, implement the necessary policies and the implementation of unconstitutional policies caused Plaintiff unwarranted and excruciating physical and mental anguish and permanent disfigurement.  Defendants consciously disregarded the rights of Plaintiff, knowing that the Policymakers would approve and/or ratify their actions. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks answers andcompensation for damages and the mental and physical injuries Plaintiff has suffered.

3.    Plaintiff alleges that the Brentwood Police Department ("BPD"), City of Brentwood, its Mayor Chris Thorton and Police Chief Joseph L. Spiess, (collectively referred

herein as the "Brentwood Policy Policymakers") failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force and/or deadly force, including those officers repeatedly accused of such acts. The Policymakers, specifically the Brentwood City Council, Mayor Thorton and Chief Spiess had a duty, but failed to implement and/or enforce policies, practices  and procedures for the BPD that respected Plaintiff's constitutional rights to assistance and protection. Defendant City of Brentwood and its Policymaker's failure to adequately supervise and discipline Defendants Bowersox, Stanze, Mueler, Lang and former Police Chief Spiess ("Brentwood Police Defendants"), implement the necessary policies and the implementation of unconstitutional policies caused Plaintiff unwarranted and excruciating physical and mental anguish and permanent disfigurement. Brentwood Police Defendants consciously disregarded the rights of Plaintiff, knowing that the Policymakers would approve and/or ratify their actions. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks answers andcompensation for damages and the mental and physical injuries Plaintiff has suffered.

4.      Plaintiff alleges that the Richmond Heights Police Department ("RHPD"), City of Richmond Heights, its Mayor Jim Thompson and Police Chief Thomas Wetzel, (collectively referred herein as the "Richmond Heights Policymakers") failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force and/or deadly force, including those officers repeatedly accused of such acts. The Richmond Heights Policymakers, specifically the Richmond Heights City Council, Mayor Jim Thompson and Chief Thomas Wetzel had a duty, but failed to implement and/or enforce policies, practices  and procedures for the RHPD that respected Plaintiff's constitutional rights to assistance and protection. Defendant City of Richmond Heights and its Policymaker's failure to adequately supervise and discipline Defendants Wiggs and

Dulaney, implement the necessary policies and the implementation of unconstitutional policies caused Plaintiff unwarranted and excruciating physical and mental anguish and permanent disfigurement. Defendants Wiggs, Karl and Dulaney consciously disregarded the rights of Plaintiff, knowing that the Richmond Heights Policymakers would approve and/or ratify their actions. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks answers andcompensation for damages and the mental and physical injuries Plaintiff has suffered.

5.      Plaintiff alleges that the Clayton Police Department ("CPD"), City of Clayton, its Mayor Harold Sanger and Police Chief Mark J. Smith, (collectively referred herein as the "Clayton Policymakers") failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force and/or deadly force, including those officers repeatedly accused of such acts. The Clayton Policymakers, specifically the Clayton City Council, Mayor Harold Sanger and Chief Mark J. Smith had a duty, but failed to implement and/or enforce policies, practices  and procedures for the CPD that respected Plaintiff's constitutional rights to assistance and protection. Defendant City of Clayton and its Policymaker's failure to adequately supervise and discipline Defendant DeVorss, implement the necessary policies and the implementation of unconstitutional policies caused Plaintiff unwarranted and excruciating physical and mental anguish and permanent disfigurement. Defendant DeVorss consciously disregarded the rights of Plaintiff, knowing that the Richmond Heights Policymakers would approve and/or ratify his actions. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks answers andcompensation for damages and the mental and physical injuries Plaintiff has suffered.

6.      This cause of action is for money damages brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of state law of Trey Cockrell's clearly established rights as

4

secured by the Fourth and Fourteenth Amendments to the United States Constitution against (1) Defendants Joshua Bowersox ("Bowersox"), Nicolas Stanze ("Stanze"), Lang ("Lang"), Wiggs ("Wiggs"), Karl ("Karl") Vargas "Vargas") and DeVorss ("DeVorss") in their respective capacities as duly-certified law enforcement officers employed by the Saint Louis County Police Department, Brentwood Police Department, Richmond Hills Police Department and Clayton Police Department (collectively, the "Defendant Officers"), for their respective violations of Mr. Cockrell's right to be free from the use of excessive force; and (2) Defendant Cities of Brentwood, Richmond Hills and Clayton ("Defendant Cities") for their unconstitutional policies, customs and/or practices under *Monell* and its progeny; Defendant Saint Louis County Police Department ("SLCD") for its unconstitutional policies, customs and/or practices under *Monell* and its progeny, and Defendant Saint Louis County ("Defendant County") for its unconstitutional policies, customs and/or practices under *Monell* and its progeny.

## **Jurisdiction and Venue**

7.     This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331, 1343, and 42 U.S.C. §1983, 1988.

8.     Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents,events, and occurrences giving rise to this action occurred in the District of Missouri. Moreover, upon information and belief, all of the parties reside in this Judicial District.

9.     Plaintiff further invokes the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims arising under the laws of the State of Missouri.

## **The Parties**

10.    At all times relevant hereto and until the time of his injuries November 21, 2018, Plaintiff was a citizen of the United States and the city of Saint Louis, County of Saint Louis, state

of Missouri.

11.    Plaintiff is a person of full age and majority.

12.    Plaintiff resides in Saint Louis County, Missouri.

13.    Defendants are being sued in their individual and official capacity as employees of the defendant Cities and defendant County.

14.    Saint Louis County is and was at all times material hereto a political subdivision of the State of Missouri, organized and existing under and by virtue of the laws of Missouri.

15.    Defendant Saint Louis County Police Department and Defendant Saint Louis County provide training for Defendant Officers at the Saint Louis County Municipal Police & Fire Academy, located in Saint Louis, Missouri.

16.    Upon information and belief, defendant Saint Louis County Police Department ("SLCPD") operates under the authority of the St. Louis County Board of Police Commissioners and is the largest law enforcement agency in St. Louis County.

17.     Upon information and belief, defendant SLCPD is directly responsible for law enforcement in unincorporated areas of the county, but also contracts for police and public safety services with several municipalities.

18.     Upon information and belief, defendant SLCPD is primarily responsible for law enforcement and investigations within the County, but also has full police authority throughout County, including its 88 municipalities, which are also served by 58 local police departments, including defendant City Police Departments in this case.

19.    At the time of Plaintiff's shooting, Chief Jon Belmar was the SLCPD Chief of Police and oversaw all police operations of all police departments within defendant County.

20.    Upon information and belief, former Chief of Police Timothy E. Fitch, was the Chief of Police at the time the SLCPD Departmental General Order 10-29 was approved by he and

defendant County's board members on April 7, 2010.

21.     Defendants, the SLCPD the Brentwood Police Department ("BPD"), Richmond Heights Police Department (RHPD), and Clayton Police Department ("CPD") are municipalities located within Saint Louis County, Missouri.  The County of Saint Louis operates these police departments.  The County of Saint Louis funds and operates the SLCPD, BPD and RHPD and CPD, which, along with the City of Brentwood, City of Richmond Heights and City of Clayton, as well as their respective City Councils, respective City Managers, respective Mayors and respective Police Chiefs, are responsible for the implementation of the police department's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. The SLCPD is also responsible for preventive, investigative, and enforcement services for all citizens of County and City of Brentwood, City of Richmond Heights and City of Clayton

22.     The City of Balch Springs may be served with citation herein by and through its agent for service of process, Cindy Gross, City Secretary, at 13503 Alexander Road, Balch Springs, Texas 75181 or wherever she may be found. Additional service is being made onMayor Carrie Marshall at 13503 Alexander Road, Balch Springs, Texas 75181.

23.     The St. Louis County Police Department ("SLCPD") is and was at all times material hereto a Missouri agency, providing the vehicle through which the defendant County and defendant Cities fulfill their policing functions.

24.     The Brentwood Police Department ("BPD") is and was at all times material hereto a Missouri agency, providing the vehicle through which St. Louis County and the City of Brentwood fulfill its policing functions.

25.     The Richmond Heights Police Department ("RHPD") is and was at all times material hereto a Missouri agency, providing the vehicle through which St. Louis County and the City of Richmond Heights fulfill its policing functions.

26.     The Clayton Police Department ("CPD") is and was at all times material hereto a Missouri agency, providing the vehicle through which St. Louis County and the City of Clayton fulfill its policing functions.

27.     SLCPD operates the St. Louis County and Municipal Police Academy ("CMPA"), a regional police training facility that provides training for BPD, RHPD and CPD.

28.      Upon information and belief, Defendant Police Officer Bowersox is and was at all times material hereto a citizen of the United States and the state of Missouri.

29.     Defendant Bowersox was at all times material hereto employed by BPD of the SLCPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

30.      Upon information and belief, Defendant Police Officer Wiggs is and was at all times material hereto a citizen of the United States and the state of Missouri.

31.     Defendant Wiggs was at all times material hereto employed by the Richmond Heights Police Department, as part of the SLCPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or undercolor of state law, and within the scope of his employment.

32.     Upon information and belief, Defendant Police Officer Dulaney is and was at all times material hereto a citizen of the United States and the state of Missouri.

33.     Defendant Dulaney was at all times material hereto employed by the RHPD, as part of the SLCPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

34.     Upon information and belief, Defendant Stanze is and was at all times material hereto a citizen of the United States and the State of Missouri.

35.     Defendant Stanze was at all times material hereto employed by the BPD, as part of

the SLCPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

36.     Upon information and belief, Defendant Lang is and was at all times material hereto a citizen of the United States and the State of Missouri.

37.     Defendant Lang was at all times material hereto employed by the BPD, as part of the SLCPD as a duly appointed and sword police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

38.     Upon information and belief, Defendant Karl is and was at all times material hereto a citizen of the United States and the State of Missouri.

39.     Defendant Karl was at all times material hereto employed by the RHPD, as part of the SLCPD as a duly sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

40.     Upon information and belief, Defendant Vargas is and was all times material hereto a citizen of the United States and the state of Missouri.

41.     Defendant Vargas was at all times material hereto employed by the RHPD, as part of the SLCPD as a duly sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

42.     Upon information and belief, Defendant Sgt. DeVorss is and was at all times material hereto a citizen of the United States and the State of Missouri.

43.     Defendant DeVorss was at all times material hereto employed by the Clayton Police Department ("CPD"), as part of the SLCPD as a duly sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

44.     Upon information and belief, Defendant Police Officer Mueler is and was at all times material hereto a citizen of the United States and the State of Missouri.

9

45.     Defendant Mueler was at all times material hereto employed by the Brentwood Police Department, as part of the SLCPD as a duly appointed and sword police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

## Factual Allegations

### A.  The Shooting of Trey Cockrell

46.     At approximately 11:40 p.m. on November 20, 2018, Defendant officers Bowersox and Stanze initiated a traffic stop and approached the stopped vehicle inside the parking lot in front of the Drury Inn & Suites, located at 8700 Eager Road, Saint Louis County, Saint Louis, Missouri.

47.     The stopped vehicle was a silver Chevrolet Malibu, license plate#DN4W3X.

48.     Plaintiff was the front passenger inside of said vehicle.

49.     Plaintiff is and was at all times a black male.

50.     Defendant Stanze approached the female driver.

51.     The female driver, Sharron Jackson, is and was at all times a black female.

52.     Defendant Bowersox approached the Plaintiff on the passenger side.

53.     Upon a request for information from both the Plaintiff and driver, both Defendant Stanze and Defendant Bowersox returned to their patrol vehicle.

54.     Plaintiff exited the stopped vehicle and began running.

55.      Defendant Bowersox initiated a foot pursuit of the Plaintiff, while Defendant Stanze remained with the driver.

56.     Information was transmitted to dispatch by multiple Officers.

57.     The incident was dispatched by the East Central Dispatch Center (E.C.D.C.), who provides police and fire dispatching services to the City of Brentwood, City of Richmond Heights

and City of Clayton.

58.     At approximately 11:41:48 a.m., Defendant Stanze informed dispatch "I got one running."

59.     At approximately 11:42:05 a.m., Defendant Bowersox informed dispatch "he's running behind deer creek."

60.     Black Creek is known as a man-made creek containing a stream of shallow water, large amounts of overgrown vegetation, high brush, overgrown trees, rocks and dirt.

61.     At approximately 11:42:26 a.m., Defendant Bowersox informed dispatch "shots fired," indicating Plaintiff allegedly fired at least one shot.

62.     Simultaneously, Defendants Wiggs, Dulaney, Lang, Karl, Vargas and DeVorss all heard the above-mentioned radio transmissions, entered their police vehicles and responded to Defendant Bowersox's location at 8700 Eager Road, Saint Louis County, Missouri.

63.     At approximately 11:44:45 a.m., Defendant Bowersox informed dispatch "additional shots fired."

64.     At approximately 11:45:27 a.m., dispatch was informed "we got one down."

65.     At approximately 11:45:36 a.m., dispatch was informed "subject in custody."

66.     At approximately 11:45:43 a.m., dispatch was informed "another in the creek."

67.     Plaintiff was the only individual present and shot at in the creek.

68.     Plaintiff was arrested and placed in handcuffs.

69.     Plaintiff did not resist arrest or attempt to flee.

70.     At the time of Plaintiff's arrest, he was not in possession of a firearm or other weapon.

71.     At approximately 12:03:00 a.m., dispatch was informed "we need a truck that can shine down into the creek."

72.    At approximately 12:08:41 a.m., dispatch was informed "requesting lighting due to darkness…lighting from firetrucks, we can't see anything down here in the ravine."

73.    Plaintiff was removed by EMS to Barnes Jewish Hospital with multiple gunshot wounds.

74.    Despite the serious allegation made against Plaintiff for allegedly discharging a firearm at defendant Officer Bowersox, Plaintiff was subsequently offered a "plea deal" by the Saint Louis County Prosecuting Attorney's Office, which consisted of only a resisting arrest charge.

75.    Plaintiff was admitted to Barnes Jewish Hospital on November 21, 2018.  Plaintiff underwent surgery due to sustaining multiple gunshot wounds caused by Defendants, including a left subtrochanteric femur fracture, scrotal gunshot wound, left testicle amputation, right testicle gunshot wound, fracture to left hand, gunshot wound to left thigh and to left hip.  Plaintiff was discharged from said hospital on November 26, 2020.

76.    Defendant Bowersox was identified as an officer that discharged his firearm at Plaintiff.  The Saint Louis County Police Department Crime Laboratory Firearm Analysis identified Defendant Bowersox's discharged firearm as a Sig Sauer, P226, 9mm Luger, with series number 47E013005, which was test fired and determined to be functioning.  A total of 15 rounds were fired at Plaintiff by defendant Bowersox.

77.    Defendant Dulaney was identified as an officer that discharged his firearm at Plaintiff.  The Saint Louis County Police Department Crime Laboratory Firearm Analysis identified Defendant Dulaney's discharged weapon as a Spike's Tactical AR-15 Rifle, Model, ST15, S/N, 19474, which was test fired and determined to be functioning. A total of 22 rounds were fired at Plaintiff by defendant Dulaney.

78.    Defendant Wiggs was identified as an officer that discharged his weapon at

12

Plaintiff.   The Saint Louis County Police Department Crime Laboratory Firearm Analysis identified Defendant Wiggs's discharged firearm as a Peer 18 9mm Luger, which was test fired and determined to be functioning.  A total of five rounds were fired at Plaintiff by defendant Wiggs.

79.     Shell casings were found at the scene, which were identified as being fired from the above-mentioned firearms and rifle belonging to defendants Bowersox, Dulaney and Wiggs.

80.     As indicated in the Saint Louis County Police Investigative Report, "due to darkness, terrain inside the creek, and flowing water, detectives suspended their search for further items of evidentiary value until daylight."

81.     As indicated in the Saint Louis County Police Investigative Report, on November 22, 2018 at approximately 8:40 am (the following morning), "while searching the area on the East side of the creek south of Eager Road, Detective Anderer and Detective King discovered a black, semi-automatic firearm resting on a ledge of the concrete retaining wall on the inside of the fence line surrounding Black Creek."  The firearm was identified as a Taurus Millennium, Model: PT111 G2, 9mm caliber, semi-automatic pistol, serial number TKN92999, with one shell casing in the chamber labeled RP 9mm Luger (hereinafter "9mm Taurus").  This firearm was alleged to have been fired by Plaintiff at defendant Bowersox.

82.     However, after a full search of the scene by defendants and investigators, no shell casings were ever recovered from said 9mm Taurus at the scene.

83.     Yet, defendant Bowersox reported to dispatch "shots fired" during the foot pursuit, presumably by Plaintiff.

84.      There were a total of eleven unfired 9mm cartridges of ammunition recovered from the 9mm Taurus magazine.

85.     Investigators reported and alleged one additional cartridge casing was discovered to have remained within the chamber of the 9mm Taurus.

86.     Investigators reported "the condition of the firearm, specifically, the alleged fired cartridge casing remaining in the chamber, was indicative of a malfunction after the weapon (9mm Taurus) was fired."

87.     Yet, the 9mm Taurus was determined to be functioning by the Saint Louis County Police Department Crime Laboratory.

88.     Defendant Officers were not in immediate imminent danger, or within close proximity of the Plaintiff or a firearm.

89.     The 9mm Taurus was not recovered from Plaintiff's vicinity at Plaintiff's location when Plaintiff was struck by multiple bullets fired by defendants.

90.     In fact, the distance between the location the 9mm Taurus was discovered and by defendants and/or investigators and the location of Plaintiff at the time he was shot repeatedly and was taken into custody was 424 feet and ten inches.

91.     To put this distance in perspective, the length of a football field is 360 feet in length and 160 feet wide.

92.     The distance between the shell casings fired by defendant Bowersox and Plaintiff at the time defendant Bowersox fired multiple rounds at Plaintiff was 80 feet 10 inches.

93.     The distance between the shell casings fired by defendant Wiggs and the Plaintiff at the time defendant Wiggs fired multiple rounds at Plaintiff was 101 feet 11 inches.

94.     The distance between a portion of the shell casings (south) fired by defendant Dulaney at the time defendant Dulaney fired multiple rounds at Plaintiff was 168 feet 7 inches.

95.     The distance between a portion of the shell casings (north) fired by defendant Dulaney at the time defendant Dulaney fired multiple rounds at Plaintiff was 149 feet 1 inches.

96.     Defendant Officers had ample "cover" distance between themselves and Plaintiff and were also at an elevated position, thereby able to maintain additional cover.

14

97.     Black Creek is flanked by concrete retaining walls on the east and west sides of the creek, which creates an approximate 15-20 foot drop from the top of the creek wall and the creek bed.

98.     Defendant Bowersox was at an elevation of approximately 5 feet 4 inches above the Plaintiff when Bowersox fired at Plaintiff multiple times.

99.     Defendant Wiggs was at an elevation of approximately 5 feet 7 inches above the Plaintiff when Wiggs fired at Plaintiff multiple times.

100.    Defendant Dulaney was at an elevation of approximately 8 feet 4 inches above Plaintiff at the time Dulaney initially discharged his rifle at Plaintiff from the southern location of the creek.

101.    Defendant Dulaney was at an elevation of approximately 8 feet 1 inch above Plaintiff when Dulaney discharged his rifle at Plaintiff from the northern location of the creek.

102.    None of the Defendant Officers had actual knowledge of Plaintiff being in physical possession of a firearm or any other weapon at the time defendants discharged their weapons at Plaintiff.

103.    At the time Plaintiff was struck by multiple bullets fired by defendants Bowersox, Wiggs and Dulaney, Plaintiff was not actively firing at any Officers, armed or violent.

104.    Without justification, Defendants Bowersox, Wiggs and Dulaney discharged their weapons and struck Plaintiff with multiple bullets throughout multiple parts of Plaintiff's body, causing serious physical injuries.

105.    All defendant Officers, including those officers that did not discharge their firearms or weapons, did not check on the Plaintiff after hearing and/or observing Officers initially discharge their weapons at Plaintiff.

106.    No officer attempted to prevent officers from discharging their weapons at

Plaintiff without justification.

98.    At no point in time did any defendant Officers verbally or physically intervene in the use of excessive force exhibited by defendants Bowersox, Wiggs and Dulaney.

99.    Defendants discharged their firearms and rifle at Plaintiff without knowledge that Plaintiff was not in possession of a firearm or any other dangerous weapon, and did not stop firing until defendant Officer Mueler yelled "watch your crossfire," as heard through dispatch.

100.  Defendant Officers who did not discharge their firearms knew of Bowersox's, Wiggs's and Dulaney's excessive behavior, but did nothing to protect Plaintiff from the harm he suffered.

101.  The defendant Cities, defendant County and defendant Policy makers knew of Defendant's risk of excessive behavior and failure to intervene and lack of training, but did nothing to protect Plaintiff from the harm he suffered.

102. The SLCPD, defendant County and defendant Cities failed to provide adequate training to all officers in the use of deadly and excessive force.

103.  The SLCPD, defendant County and defendant Cities failed to provide adequate training to defendant officers on appropriate methods and techniques to control situations similar to one created by defendant officers.

104. The SLCPD, defendant County and defendant Cities knew or should have known that the training provided to defendant Officers was inadequate or non-existent.

105. As made clear by those Officers who did not discharge a firearm, but did fail to intervene, Plaintiff posed no threat of imminent death or great bodily harm to any of the defendant Officers from Plaintiff's immediate location at the time Plaintiff was struck by multiple bullets fired by defendant Officers.

106.  At the time Bowersox engaged in a traffic stop and subsequently engaged in a foot pursuit of Plaintiff and discharged his (Bowersox's) firearm, there had been no previous interaction between Plaintiff and Bowersox.

107. At the time defendants Wiggs and Dulaney discharged their firearm and rifle, there had been no previous interaction between Plaintiff and defendants Wiggs and Dulaney.

108. The drawing of an Officer's weapon inherently assumes that the use of force will cause death or serious bodily injury to the suspect, and is to be applied under very narrowly defined circumstances.

109. Defendant Officers excessive, unlawful and unwarranted acts, lack of training and the official customs or policies of the defendant Cities and defendant County caused Plaintiff's serious and permanent injuries.

110. Plaintiff would show that at all times material hereto, defendant Officers were acting under color of law when they shot and seriously injured Plaintiff and/or failed to intervene.

111. Plaintiff was not found in possession of a firearm or other dangerous weapon, precisely at the time and location he was struck by multiple bullets fired by defendants, while darkness and overgrown trees and vegetation did not allow defendants to clearly see Plaintiff, if at all.  Given these facts, no reasonably competent official would have concluded that the shooting actions of defendants Bowersox, Wiggs and Dulaney would not violate Plaintiff's constitutional rights.  No reasonably prudent officer under these circumstances could have believed that the actions and conduct of defendant Bowersox, Wiggs and Dulaney were justified, or that the treatment of Plaintiff was reasonable.

112. As a direct and proximate result of all Defendant's conduct, Plaintiff sustained substantial damages and pecuniary loss.

113. Plaintiff was 24 years old at the time he sustained his injuries.  He maintained gainful

17

employment and was working full time.  Plaintiff currently has no children.  He aspired to become a father, but his sustained injuries have now reduced his ability to have children significantly.  Plaintiff sustained significant injuries, including but not limited to, a left subtrochanteric femur fracture, scrotal gunshot wound, left testicle amputation, right testicle gunshot wound, fracture to left hand, gunshot wound to left thigh and to left hip.  Plaintiff also suffers from constant nerve damage and loss of strength in his hand, significant pain when attempting to walk for a very short period of time, requiring the use of a cane and significant pain when attempting to sit.  Plaintiff can no longer run, jump or play any sports. For these injuries and bodily loss, Plaintiff seeks damages in a sum in excess of the minimum jurisdictional limits of the court.

114. Upon information and belief, the SLCPD, BPD, RHPD, CPD, all defendant Chiefs of Police, defendant County, defendant City Police Departments did not and have not implement(ed) policies and procedures to aggressively and adequately reduce injuries as a result of the improper use of excessive and potentially deadly force, nor have they disciplined Officers involved in a cover-up of a crime.

### B. Policy Making Authority Promulgated Training Policies Encouraging Deadly & Excessive Force in Non-Deadly Circumstances, Thereby Reflecting a Deliberate Indifference To Plaintiff's Constitutional Rights

115. The Department of Justice (DOJ) defines deadly force as "the use of any force that is likely to cause death or serious physical injury.  The use of force must be objectively reasonable under all the circumstances known to the Officer at the time.  The necessity to use deadly force arises when ALL other available means of preventing imminent and grave danger to officers or other persons have failed or would be likely to fail.  Thus, employing deadly force is permissible when there is no safe alternative to using such force, and without it the officer or others would face imminent and grave danger."

116. The DOJ further established that deadly force should never be used upon a mere suspicion that a crime, no matter how serious, was committed, or simply upon the officer's determination that probable cause would support the arrest of the person being pursued or arrested for the commission of a crime."

117. SLCPD, BPD, RHPD & CPD (hereinafter "Police Departments") trained its officers that the discharging of firearms or rifle was an authorized form of deadly force, and that said discharging was a form of deadly force capable of causing serious bodily injury and/or death, even when Officers did not have knowledge that imminent threat or deadly forced was being used against them.

118. Defendant Police Departments assumed Plaintiff was in physical possession of a firearm, or within reach of said firearm at the time they shot at Plaintiff multiple times.

119. Plaintiff was not within reach of a firearm.  The single firearm, which was recovered the next morning, was recovered approximately 424 feet 10 inches (approximately 144.33 yards) away from Plaintiff's location at the time Plaintiff was fired upon by Defendant Officers.

120. Defendant officers did not follow any of the Use of Force Continuums under The General Orders for defendant Police Departments.

121. At all times material hereto, the defendant SLCPD's Departmental General Order (hereinafter "DGO") 10-29 Use of Force, provides "while the use of reasonable physical force may be necessary in situations which cannot be otherwise controlled, force may not be resorted to unless other reasonable alternatives have been exhausted or would likely be ineffective under a particular set of circumstances."

122. The DGO also provides "where deadly force is not authorized, officers should assess the incident in order to determine which nondeadly technique or less lethal weapon will best de-

escalate the incident and bring it under control in a safe manner."

      123. Upon information and belief, the SLCPD's Use of Force Continuum, which is generally followed by Defendant City Police Departments, is as follows:



      124. At all times material defendant Police departments trained its officers to

disregard the permitted levels of response to resistance and did not prepare its Officers with scenario-based training, by which defendant Officers can apply said levels of response.

125. Defendant Officers breached their duty to intervene to prevent the use of excessive force.

126. Officers are bound by the DGO policy.  Officers are required to "take appropriate action to protect life and property and otherwise enforce all federal, state, and local laws.  An officer engaging in excessive force may be committing an assault, and another officer would, therefore, be required to act to stop the assault."

127. Defendant Officers also breached their duty to truthfully report the use excessive force by other Officers, especially officers who discharged their firearms/rifle.  In addition, defendant Officers were not discipled for their use of excessive force.  The DGO policy provides "any employee who fails to report physical or verbal abuse against any citizen by another member of this department is subject to disciplinary action."

128. The Richmond Heights Police Department and General Order further provides "a Police officer will never employ unnecessary force or violence and will use only such force in the discharge of duty as is reasonable in all circumstances.  The use of force should be used only with the greatest restraint and only after discussion, negotiation, and persuasion have been found to be inappropriate or ineffective.  While the use of force is occasionally unavoidable, every Police Officer will refrain from applying the unnecessary infliction of pain or suffering and will never engage in cruel, degrading, or inhuman treatment of any person."

129. The Clayton Police Department ("CPD") General Order provides "the decision to use force requires careful attention to the facts and circumstances of each particular case, including …whether the suspect poses an immediate threat…"   "Excessive force or misuse of force, is strictly forbidden."  Immediate threat is defined as "imminent or impending peril.

130. The CPD General Order Use of Force Continuum provides for lethal force only if the level of resistance creates an "aggravated active aggression with intent to cause death or serious physical injury."

131. None of the Defendant's General Orders include a policy that allows Police Officers to use deadly force when said Officers recklessly place themselves in harms way.

132. At all times material hereto, Defendant Police Departments trained its officers that excessive force is justified, so long as the Officer's actions were "objectively reasonable," even when a suspect is a "no shoot target" and the totality of the circumstances do not provide the Officer with certainty that deadly force or force that can cause serious physical injury is warranted.

133. Serious bodily injury and/or death is reasonably likely to result from multiple Officers discharging their firearms/rifle at a suspect, regardless of how many times a particular Officer's bullet strikes the suspect, or whether or not the suspect is killed.

134. The discharging of a firearm/rifle, as defined by the SLCPD, BPD, RHPD and CPD constitutes deadly force.

135. The Fourth Amendment prohibits the use of deadly force in non-deadly circumstances, which do not pose an immediate threat of serious bodily injury and/or death.

136. At all times material hereto, SLCPD, BPD, RHPD and CPD's written policies authorized the use of deadly force in non-deadly circumstances posing no immediate threat of serious bodily injury or death.

137. At all times material hereto, SLCPD, BPD, RHPD and CPD trained its Officers that the discharging of a firearm/rifle, which constitutes deadly force, was an authorized action Officers could use in non-deadly situations.

138. At all times material hereto, SLCPD, BPD, RHPD and CPD did not warn its Officers that use of force, which can cause serious injury or death, was not authorized in an "assumption

based" scenario.

139. Specifically, Officers were not warned that they could not use deadly force if they assumed a suspect presented an imminent threat of immediate use of deadly force, such as the assumed physical possession of a firearm by a suspect at the time Officers discharge their weapons at Plaintiff in this case, while there was zero or very poor visibility of Plaintiff and Officers were unable to determine if the suspect was armed.

140. In fact, from at least April 7, 2010 until November 20, 2018, the SLCPD General Order 10-29, as well as the General Orders for BPD, RHPD, and CPD defined use of deadly force, but did not warn against its use in circumstances under which Plaintiff was shot at multiple times and sustained multiple serious injuries.  Specifically, Officers were not warned against the use of deadly force when: (a) a suspect is not actively engaging in actions constituting a clear and imminent threat of deadly force or actual deadly force; (b) a suspect is not in physical possession of a deadly weapon or within reaching distance of said firearm, (c) visibility of the suspect is poor or non-existent, (d) a suspect is not within the immediate vicinity of Officers (e) Officers have the ability to take cover without discharging their weapons; (f) de-escalation is available, and (g) possible signs of mental or emotional issues require the request of a Crisis Intervention Team (CIT) Officer.

141. By policy, the SLCPD, BPD, RHPD and CPD allowed, accepted and condoned the use of excessive deadly force towards both active and non-active suspects.

142. Training offered by the SLCPD, BPD, RHPD and CPD Officers encouraged officers to simply rely on an "objective reasonableness" standard without training, applying, and considering the specific foreseeable circumstances under which Officers discharged their weapons and seriously injured Plaintiff.

**C.  SLCPD, Defendant City Police Departments, Saint Louis Police Academy and Saint Louis County's Failure to Train its Officers to De-escalate and to Intervene Was The Moving Force Behind The Causal Link Between the Municipal Action & Deprivation of Plaintiff's Federal Rights**

143. While the Supreme Court established an "objective reasonableness" standard in

Tennessee v. Garner (1985), the Department of Justice has since urged that "police departments still

have a substantial responsibility in developing their own policies on the use of deadly force, training

their officers in following these policies to carry out their duties."

144. Upon information and belief, de-escalation tactics and techniques would include

actions used by Officers that seek to minimize the likelihood of the need to use force during an

incident and increase the likelihood of voluntary compliance.  These actions include police actions

that reduce the immediacy of the threat so that more time, options and resources are available to

resolve the situation.

145. Defendant, SLCPD has a longstanding record of not providing its County Officers and

police departments with adequate use of force and de-escalation training.  Prior to Plaintiff's

shooting, Saint Louis County and SLCPD had in fact delegated policy-making authority to former

Chief of Police Colonel Timothy E. Fitch ("Chief Fitch") and former Chief of Police Jon Belmar

("Chief Belmar"), giving them the responsibility for setting training policies and knew that there

were training issues, which subsequently facilitated the shooting of Plaintiff.

146. The SLCPD, Saint Louis County, former Chief Belmar and former Chief Fitch knew

or should have known that the training provided to defendant Police Officers was inadequate or

non-existent.

147. As early as 1999, the Department of Justice (DOJ) advised "modern training includes

techniques to use the least amount of force necessary to overcome the subject."

148. The DOJ also warned that "police departments should also provide training tactics that

are useful in averting violence where confrontation is necessary," such as "conflict resolution,"

which has proven to "prevent physical conflict and save the lives of many people, including officers and suspects."

149. In its 2014 Collaborative Reform Initiative, which defendant Police Chief Jon Belmar of the SLCPD specifically requested participation in, the DOJ urged defendant SLCPD to "enhance basic academy and supervisor in service training…including de-escalation training."  The DOJ also urged defendant SLCPD to "reduce use of force and injuries to both officers and citizens."

150. In 2015, the DOJ warned that "training on use-of-force issues should be more holistic and integrated, with fewer lecture-based training sessions, and more scenario-based training, in which officers are put through realistic role-playing exercises where they must make choices about how to respond to the types of incidents that often occur."  The DOJ advised that the most efficient way to train officers to handle difficult situations is to equip them with the different scenarios, in which all of the situations are considered at the same time, and officers can train to handle such scenarios, while also abiding by department policies and making decisions.

151. In 2016, the Police Executive Research Forum (PERF) warned that the "de-escalation policy should also include discussion of proportionality, using distance and cover, tactical repositioning, slowing down situations that do not pose an immediate threat, calling for supervisory and other resources.  Officers must be trained in these principles, and their supervisors should hold them accountable."

152. Although defendants SLCSD, BCPD, RHPD, CPD ("defendant Police Departments"), the Chiefs of Police and defendant County were warned of the urgent need for a de-escalation policy, all of these defendants disregarded said warnings and failed to incorporate a specific de-escalation policy in any of their General Orders for policing prior to the shooting of Plaintiff, including a failure to specifically incorporate any scenario-based de-escalation policy.

153. The Saint Louis County Police Department (SLCPD) formal and memorialized

General Order for policing is outdated.

154. Upon information and belief, the SLCPD General Order in effect at the time of Plaintiff's shooting is dated April 7, 2010.  Plaintiff sustained his injuries in this case on November 20, 2018.

155. Upon information and belief, the SLCPD April 7, 2010 General Order was ordered and approved by defendant former Chief of Police Colonel Timothy E. Fitch ("Chief Fitch") at defendant Saint Louis County's board meeting on said date.

156. Upon information and belief, this April 7, 2010 General Order was distributed to "all department personnel," including all defendant Police Departments.

157. Defendants SLCPD, Saint Louis County, former Chief of Police Jon Belmar ("Chief Belmar") failed to include a de-escalation policy section within said April 7, 2010 General Order, which these defendants knew would be distributed to all defendant City Police Departments throughout defendant County and it was foreseeable defendant Police Departments would rely on said Order.

158. Defendants former Chief Belmar and Chief Fitch also subsequently failed to include a de-escalation policy section within said April 7, 2010 SLCPD General Order.

159. The conscious and reckless omission of a de-escalation policy by defendants SLCPD, Chief Belmar, Chief Fitch and defendant County further demonstrates a deliberate indifference to Plaintiff and the known risk of death or serious injury, which Plaintiff did sustain.

160. Defendant SLCPD continues to demonstrate a clear deliberate indifference for the black individuals that either reside or pass through its County, with no real intent to incorporate a de-escalation and adequate use of force policy in its General Order.

161. In an interview for "5 On Your Side" on June 9, 2020, Saint Louis County Executive, Dr. Sam Page called for the review of the SLCPD's use of force policies.

162. Upon information and belief, it was reported that at the time of said interview, the #8cantwait campaign, a campaign with a mission of bringing immediate change to police department discovered "de-escalation is not required" by defendant County.

163. In that same interview, Board of Aldermen President Lewis Reed warned "these policy changes are long overdue."

164. On July 28, 2020, Dr. LJ Punch, a trauma surgeon, community advocate and Saint Louis County Commissioner sent a letter to current SLCPD Chief Mary Barton addressing the SLCPD's Use of Force Policy.  In sum and substance, Dr. Punch warned that the SLCPD Use of Force Policy "does qualify situations in which deadly force is not authorized, as if it is the primary posture and de-escalation is a compromise rather than a primary posture.  It does not include decisive language to exhaust all efforts before lethal force."

165. In response to Dr. Punch's warnings, Lieutenant Colby Dolly ("Lt. Dolly"), commander of the Bureau of Research and Analysis for defendant SLCPD, stated "actually, I see Punch's point here.  I will concede that our current use of force policy, the language can be improved.  What I envision is that we do need to make clear, even in the layout of the policy, that the default starting position is that you don't use any force.  That's where everything begins, is that we do not want to use force and we shall de-escalate as much as possible and exhaust everything reasonable before using force.  I do agree that there is room for improvement there."

166. Yet, defendant SLCPD continues to fail to disregard these known and publicly acknowledged risks, further facilitating an obvious deliberate indifference to potential victims of force and/or excessive force.

167. As of November 13, 2020, defendant SLCPD further acknowledged the department had no formal de-escalation policy regarding use of force.

168. On November 13, 2020, the SLCPD held a virtual Use of Force Seminar, which was

hosted by Lt. Doly.  During said seminar, the following question was posed to Lt. Dolly: Where are the provisions for de-escalation technique?" Lt. Dolly responded: Very good question.  I actually agree with that point.  If it's a point saying we need to have that in the policy, I would agree with that.  …If you're saying it needs to be spelled out in terms of what does that mean and what you (Officers) should do, I would agree with you."

169.  Defendant SLCPD and defendant County has clearly continued to demonstrate deliberate indifference and has and continues to disregard the known and foreseeable risk of death or serious physical injury, which is more likely to occur without an official and adequate de-escalation and use of force policy.

170. Upon information and belief, defendant Richmond Heights Police Department's (RHPD) General Order on Rules of Conduct Policy, dated December 15, 2000, also failed to include a specific de-escalation policy.

171. Upon information and belief, the RHPD's December 15, 2000 General Order on Rules of Conduct Policy was reviewed by Captain Joe Zimmerman, was approved by Chief Gerry Rohr ("Chief Rohr") and was in effect at the time Plaintiff sustained his serious injuries.

172. Defendant RHPD then revised its December 15, 2000 General Order on Rules of Conduct Policy on June, 9, 2021, but has still failed to incorporate a de-escalation policy regarding use of force and deadly force.

173. Upon information and belief, this revised General Order on Rules of Conduct was approved by Chief Gerry Rohr and reviewed by Captain Joe Zimmerman of the RHPD.

174. Upon information and belief, the RHPD's separate Use of Force General Order was not in effect until February 11, 2019.  Ironically, this was less than two months after Plaintiff's shooting.

175. Defendant RHPD's February 11, 2019 revision of its Use of Force General Order was approved by Chief W. Schaeffler, the Police Chief for RHPD at the time of Plaintiff's shooting.

176. Nevertheless, and even further evidence of a reckless disregard for the preservation of life, defendant RHPD still failed to include a specific de-escalation policy in said February 11, 2019 revision of its Use of Force General Order.

177. The February 11, 2019 revised Use of Force General Order was approved by Chief Douglas W. Schaeffler.

178. Defendant SLCPD's February 11, 2019 General Order on Use of Force was then revised on December 8, 2020 and included a mere eighteen (18) word sentence, in which the word "de-escalation" was mentioned, without any specific reference to de-escalation techniques, skills, scenarios, de-escalation levels of response, etc.

179. Upon information and belief, this December 8, 2020 revision of the General Order on the Use of Force was also approved by Chief Rohr.

180. The conscious and reckless omission of a specific, effective and adequate de-escalation policy by defendants RHPD, City of Richmond Heights, Chief Rohr, Chief Schaeffler and defendant County further demonstrates a deliberate indifference to Plaintiff and the known and/or foreseeable risk of death or serious injury, which Plaintiff did sustain.

181. Defendant Officers Jeffrey Wiggs (Officer Wiggs), Officer Jeffrey Dulaney (Officer Dulaney), Officer Matt Karl (Officer Karl), and Vargas (Officer Vargas) of the RHPD failed to apply any de-escalation techniques to "slow the situation down."

182. Defendant Officers Jeffrey Wiggs (Officer Wiggs), Officer Jeffrey Dulaney (Officer Dulaney), Officer Matt Karl (Officer Karl), and Vargas (Officer Vargas) of the RHPD failed to intervene and attempt to apply any de-escalation tactics and/or prevent the use of force and/or excessive force by other defendant Officers, either directly, through police radio communication or other means.

183. Upon information and belief, defendant Officer Wiggs discharged his firearm at

Plaintiff, while Plaintiff's back was facing defendant Wiggs, without applying any effective de-escalation techniques, and while knowing visibility of Plaintiff and the presence of an alleged firearm was poor or completely void.

184. Defendant Officer Wiggs also failed to intervene to stop other defendant Officers from using excessive force against Plaintiff.

185. Upon information and belief, defendant Officer Dulaney discharged his rifle at Plaintiff, even though defendant Dulaney was unable to determine if Plaintiff was in possession a firearm, and without attempting any effective de-escalation techniques, knowing visibility of Plaintiff and the presence of an alleged firearm was poor or completely void.

186. Defendant Officer Dulaney also failed to intervene to stop other defendant Officers Officers from using excessive force.

187. Upon information and belief, defendant Officer Karl was also aware that Plaintiff was located in Black Creek, a dark creek void of adequate lighting.  During his on scene initial statement to investigators, defendant Karl stated "visibility of the suspect was restricted due to overgrown vegetation within the creek."  Nevertheless, defendant Karl still failed to apply any de-escalation techniques or tactics once he arrived on the scene, knowing visibility of Plaintiff and the presence of an alleged firearm was poor or completely void.

188. Defendant Officer Karl also failed to intervene to stop other defendant Officers from using excessive force against Plaintiff.

189. Upon information and belief, defendant Officer Vargas was in the vicinity of Black Creek at the time of Plaintiff's shooting and failed to apply any de-escalation techniques or tactics upon his arrival at the scene, or through radio transmission, knowing visibility of Plaintiff and the presence of an alleged firearm was poor or completely void.

190. Defendant Vargas also failed to intervene to stop other defendant Officers from using

excessive force against Plaintiff.

191. Upon information and belief, the Clayton Police Department's ("CPD") de-escalation policy section wasn't incorporated in the CPD's General Order until after Plaintiff's sustained serious injuries on November 20, 2018.

192. The CPD General Order was ordered, approved and executed by defendant Chief of Police Mark J. Smith on May 26, 2021.

193. Upon information and belief, defendant Kevin Murphy ("Chief Murphy" was the Chief of Police for the CPD at the time of Plaintiff's shooting.

194. Upon information and belief, Defendant Chief Murphy, failed to include a specific de-escalation policy or specific duty to intervene policy in the CPD General Order.

195. Upon information and belief, defendant Chief Murphy failed to include a specific de-escalation policy within a CPD General Order Policy or Use of Force Policy.

196. Upon information and belief, defendant CPD failed to have a de-escalation policy in effect at the time of Plaintiff's shooting.

197. Even if a CPD de-escalation policy was included in a CPD General Order at the time of Plaintiff's shooing, defendant Sergeant DeVorss failed to apply said de-escalation policy to the circumstances surrounding the shooting of Plaintiff, as the CPD de-escalation policy provides: "de-escalation tactics can include using distance and cover…and slowing down situations to allow more time for resolution."

198. The conscious and reckless omission of a specific, effective and adequate de-escalation policy or duty to intervene policy, by defendants CPD, City of Clayton, Chief Murphy, and defendant County further demonstrates a deliberate indifference for Plaintiff and the known and/or foreseeable risk of death or serious injury, which Plaintiff did sustain.

199. While arriving at the scene of Plaintiff's shooting, Officer DeVorss later reported, in

sum and substance, he was aware Plaintiff was inside of Black Creek.

200. Black Creek was void of lighting and made it difficult to see if Plaintiff was armed.

201. Defendant Officer DeVorss of the CPD failed to apply any de-escalation techniques to "slow the situation down."

202. Defendant Officer DeVorss failed to intervene and failed to apply any de-escalation techniques, or to prevent the use of force and/or excessive force by other defendant Officers, either directly, through police radio communication or other means.

203. Upon information and belief defendant Officer Gleason was aware Plaintiff was located within Black Creek, which was void of adequate lighting.

204. Defendant Gleason failed to apply any de-escalation techniques or tactics once he arrived on the scene, knowing visibility of Plaintiff and the presence of an alleged firearm was poor or completely void.

205. Defendant Officer Gleason of the CPD failed to apply any de-escalation techniques to "slow the situation down."

206. Defendant Officer Gleason failed to intervene and failed to apply any de-scalation techniques, or to prevent the use of force and/or excessive force by other defendant Officers, either directly, through police radio communication or other means.

207. Upon information and belief, defendant Brentwood Police Department ("BPD") did not have a separate Use of Force Policy or General Order in effect at the time of Plaintiff's shooting.

208. Upon information and belief, defendant BPD failed to provide its Officers with a Use of Force Policy or General Order containing de-escalation tactics and techniques.

209. Upon information and belief, defendant Joseph Spiess ("Chief Spiess") was the Chief

of Police for defendant BPD at the time of Plaintiff's shooting.

210. Upon information and belief, Chief Spiess failed to maintain a Use of Force Policy or General Order, which contained a de-escalation policy for Officers facing the use of force and excessive force circumstances, which lead to the shooting of Plaintiff.

211. Upon information and belief, Chief Spiess failed to maintain a Use of Force Policy or General Order, which consisted of a duty to intervene policy concerning the use of force or excessive force, which lead to the shooting of Plaintiff.

212. The conscious and reckless omission of a specific, effective and adequate de-scalation policy or duty to intervene policy, by defendants BPD, City of Brentwood, Chief Spiess, and defendant County further demonstrates a deliberate indifference for Plaintiff and the known and/or foreseeable risk of death or serious injury, which Plaintiff did sustain.

213. Defendant Officer Bowersox, of the BPD, was aware Plaintiff was located within Black Creek, which was void of lighting, prior to the shooting of Plaintiff.

214. Defendant Officer Bowersox failed to apply any de-escalation techniques or tactics prior to discharging his firearm at Plaintiff.

215. At the time defendant Bowersox discharged his firearm at Plaintiff, defendant Bowersox was unable to determine if Plaintiff was in physical possession of a firearm.

216. Defendant Officer Bowersox failed to apply any de-escalation techniques or tactics to "slow the situation down" and avoid the use of force and/or excessive force by other defendant Officers, either directly, through police radio communication or other means.

217. Defendant Officer Bowersox failed to intervene to prevent the use of force and/or excessive force by other defendant Officers, either directly, through police radio communication or other means.

218. Despite the warnings and known foreseeable risks, defendant Officers of all defendant

Police Departments were not provided with official training on de-escalation or a duty to intervene prior to the shooting of Plaintiff.

219. The lack of training in the areas of de-escalation, use of force and duty to intervene has and continues to demonstrate a direct and proximate cause of defendant Police Department's deliberate indifference to the known risk of death or serious physical injury for Plaintiff(s).

220. Plaintiff was not the first black man to become the victim of deadly and excessive force exercised by an Officer trained by defendant Saint Louis County Police Academy.

221. On August 31, 2014, Michael Brown Jr, an 18 year old black man, was fatally shot by 28 year old white police officer Darren Wilson, in the City of Ferguson, Saint Louis County.

222. According to a witness present with Brown, Officer Wilson initiated a confrontation with Brown by grabbing Brown by the neck through Brown's car window, threatening him and then shooting at him, rather than applying any de-escalation techniques.

223. Brown then fled.  Wilson pursued Brown and shot at Brown's back.  Brown turned around with his hands raised.  Wilson then shot multiple times until Brown fell to the ground.

224. Wilson fired a total of 12 bullets at Brown.

225. A grand jury 'no billed' Wilson due to poor police investigation.  Officer Wilson resigned shortly thereafter in November of 2014.

226. Defendant SLCPD and Ferguson Police Department failed to take any disciplinary or other remedial action towards Officer Wilson.

227.  However, in 2017, Brown's family settled a wrongful death lawsuit for $1.5 million dollars.

228. The Brown shooting led to a Department of Justice (DOJ) investigation that resulted in

a consent agreement requiring the City of Ferguson, a city within defendant Saint Louis County, which also trained Ferguson Officers at defendant Saint Louis County Police Academy.

229. The DOJ found that the police and the courts routinely violated people's rights.  Black individuals were disproportionately impacted by police practices, which included using petty violations and regular traffic stops.

230. Similarly, the Plaintiff in this case was initially the victim of a petty traffic stop.

231. Notwithstanding the defendant County's acknowledgement of warnings regarding a failure to train its officers adequately in the areas of de-escalation and use of force, defendant County continued to exercise deliberate indifference towards the very same individuals they swore to "serve and protect," such as the Plaintiff in this case.

### D.  History of the SLCPD, Saint Louis County Police Academy, Saint Louis County and Defendant City Police Department's ("Municipal Defendants") Acting as a "Moving Force" by Providing and Permitting Warrior Style or "Killology" Training, Which Further Facilitated a Causal Link Between the Municipal Action & the Deprivation of Plaintiff's Federal Rights

232. Upon information and belief, Municipal defendants have a long history of permitting its officers to receive and engage in "Killology" or "warrior style" training at the Saint Louis County Regional Law Enforcement Training Conference, at least as far back as October of 1999, a history well embedded within the fabrics of training by Municipal defendants.

233. Upon information and belief, a significant proportion of police officers trained by the Saint Louis County Police Academy had received "Killology" training during their employment.

234. Upon information and belief, high-ranking officers, agents and policy makers of the Saint Louis County Police Departments, defendant City Police departments, defendant County and defendant Cities, offered this training free of charge to all officers of the MPD who wanted to

receive it.

235. Upon information and belief, "Killology" training was knowingly permitted at the Saint Louis County Police Academy in May of 2000.

236. Upon information and belief, "Killology" training was knowingly permitted at the Saint Louis County Police Academy in January of 2006.

237. The "warrior cop" mindset is taught by retired Army Lieutenant Colonel, Dave Grossman, one of the most controversial law enforcement instructors in the country.

238. The "warrior cop" mentality teaches police officers to start from a place of fear, which can encourage them to quickly turn to the use of deadly force, instead of considering de-escalation tactics and/or non-deadly force.

239. The "Killology" mindset teaches officers that the very same streets they patrol are "war zones" and police officers are soldiers.

240. "Killology" trains Officers to apply deadly force within the rules of engagement, as if policing was occurring within a military or war environment.

241. Police Officers (soldiers) are encouraged to use of deadly force as quickly as possible.

242. Upon information and belief, Grossman has gone on record stating "you've probably heard of the Big Bang Theory.  I'll call this the Bigger Bang Theory, which states that, all other things being equal, in combat, whoever makes the bigger bang wins."  "Your job is to stop the deadly threat, and the most effective way to do that is to make the threat die."

243. There is a causal link between this mentality and the circumstances that surrounded the shooting of Plaintiff in this case.

244. Here, defendant Officers certainly displayed a "bigger bang" when they used excessive and deadly force by firing multiple rounds at Plaintiff.

245. Multiple defendant Officers had the mindset to shoot at Plaintiff without first

applying any de-escalation techniques or intervening to prevent the use of excessive and/or deadly force.  This mindset is consistent with the "Killology" and "warrior mindset" defendant Municipalities permitted its officers to be trained by.

246. Upon information and belief, defendant Officer Bowersox can be heard through police dispatch communication stating "shots fired" at 11:42 p.m. on November 20, 2018.

247. Upon information and belief, just three minutes later, an Officer can be heard through dispatch stating "we got one down" at 11:45 p.m.

248. Defendant Officers failed to de-escalate and assess whether or not Plaintiff was posing an active and immediate threat, after the report of an alleged "shots fired," specifically at the time defendant Officers elected to fire upon Plaintiff.

249. In the absence of an immediate and active deadly threat, defendant Officer's actions were objectively unreasonable and excessive.

250. In this case, defendant Officers who shot at Plaintiff, did so without hesitation or adequate consideration for de-escalation, which would have "slowed the situation" down.

251. Instead, the trained method of assessing the totality of the circumstances was simply to "shoot to kill" the Plaintiff, which was an "autopilot" response "killology" teaches.

252. In essence, defendant Officers wanted to "make the threat die."

253. However, there was no threat, as Plaintiff was not in possession of a gun at the time he he was shot by multiple defendant Officers.

254. The alleged "threat" was over 424 feet away from Plaintiff.  No "threat" at all.

255. No reasonable Officer would constitute such a distance as an immediate threat, if the Officer was trained to assess and de-escalate the situation and subsequently determine Plaintiff was not firing at defendant Police Officers and was not in possession of a gun, or weapon.

256. None of the Defendant Officers made any adequate or reasonable attempt to avoid

shooting the Plaintiff.

257. Upon information and belief, defendant Officers only fired at Plaintiff because they assumed Plaintiff had a gun at the time, as no gun was ever recovered from Plaintiff's person, or within his vicinity.

258. These defendant Officers were on "autopilot" mode, as opposed to a trained de-escalation mode, which was never trained.

259. The defendant Police Officer's rushed decisions to "shoot to kill" the Plaintiff, was a direct and causal link between the Municipal defendant's permitted "Killology" training and said defendant Officer's failure to de-escalate and avoid the use of excessive and deadly force.

260. Upon information and belief, police departments are now banning "warrior style" training.  For example, nearly two months after the killing of George Floyd in 2020, the state of Minnesota banned this training method.  During the killing of Mr. Floyd, Officer Derek Chauvin was filmed placing his knee into the neck of Mr. Floyd while he was on the ground and disregarding Floyd's "I can't breathe" pleas.  Officer Chauvin was later convicted of second-degree murder and sentenced to twenty years in prison.  An additional three officers who failed to intervene were also charged and are awaiting their trials.

### E.  The Saint Louis County Police Department And/Or its Municipal Defendant City Police Department's History of Hiring & Failing to Supervise Dangerous Police Officers

261. Defendant Saint Louis County Police Department (SLCPD) has often allowed its City police departments to hire police officers who are dangerous and have engaged in police misconduct.

262. Upon information and belief, defendant SLCPD has participated in the shuffling of police officers with questionable misconduct records.

263. In 2016, former police officer Ellis Brown was employed by the St. Louis Police

38

Department.  Officer Brown and his partner were following a car and the driver lost control, hit a light pole, causing a fire that engulfed the car.  Officer Brown and his partner failed to give aid or notify dispatch to send EMS.  Officer Brown and his partner then lied about the incident in reports.  Brown left the department and was hired by St. Ann Police within two months, one of the police departments within the defendant SLCPD.

264. Defendant SLCPD and defendant County was also on notice that prior to the above mentioned 2016 incident, Brown was also involved in the shooting death of 25-year old Kajieme Powell in 2014.  The family later filed a wrongful death suit in the U.S. District Court of St. Louis.

265. In 2017, defendant SLCPD was on notice that St. Ann Police Department hired Officer Joshua Becherer after he resigned from the St. Louis Police Department.   Becherer resigned from the department after he was arrested for a domestic violence assault.  He allegedly pointed a rifle at a woman's face and threatened to kill her.  Upon a state investigation, his police license was placed on probation.

266. In 2020, St. Ann Police Department also hired former Officer Mark Jakob.  Jakob was accused of lying to superiors about a 2018 police chase that ended in the deaths of Mikel Neil and Townsal.  Initially, it was reported that Officer Jakob's police vehicle never chased the car.  However, surveillance video showed officers speeding after the vehicle.  The families sued the County in a wrongful death lawsuit.

267. In 2020, defendant SLCPD had notice of and permitted the St. Ann Police Department to also hire former St. Louis Police Officer Christopher Tanner.  Tanner shot and killed fellow Officer Milton Green, a black male.  Green sued the police department and Tanner alleging his race was a factor in the shooting.  Tanner was also a defendant in another lawsuit filed by a man who alleged Tanner used a taser on him while he was handcuffed on the ground.

268. Shortly thereafter, St. Ann also hired former St. Louis police officer Jonathan Foote

after he chased a vehicle against department policy, causing the vehicle's occupant, Joseph Powell, to crash and die from his injuries.

269. Upon information and belief, defendant SLCPD and defendant County were on notice of its Officers and or agent's intent to further engage in the above referenced incidents of excessive use force, even when completely and recklessly disregarding police policy.  For example, in 2018, St. Ann Police Chief went on record, as reported by new reporters and media entities, stating "make no mistake, St. Ann will chase you until the wheels fall off.  I've said it over and over and I stand by that."

270. Upon information and belief, defendant Saint Louis County also had notice of and permitted the hiring of Police Officer Joseph Sorbello, even after he was accused of beating suspects and fabricating evidence while he was with the Maplewood Police Department.  Officer Sorbell was then permitted to be hired by the Bridgeton Terrace Police Department and later shot and killed a man who was breaking into his vehicle.

271.  Upon information and belief, the Bridgeton Terrace Police Department was also a department defendants and former SLCPD Chiefs of Police, defendant County and defendant Saint Louis County Police Academy either trained and/or oversaw police policy and County operations of.

### F.  The Saint Louis County Police Department & Defendant City Police Department's History of Racially Biased Policing

272. Upon information and belief, in 2018, Saint Louis County, Missouri had a population of approximately 997,000 people.

273. Upon information and belief, blacks or African Americans (non-Hispanic) accounted for 24.4% of the total population.

274. Upon information and belief, from 2009-2019, at least 179 people have been killed by

40

police in areas including defendant Saint Louis County.

275. The majority of people killed (92%) were men.

276. 72% of the of the 179 people killed were black people.

277. In its 2016 Collaborative Reform Initiative of the Saint Louis County Police Department and its defendant Cities, the U.S. Department of Justice urged defendant County and Cities to change their policies as "the department lacks the training, leadership and culture necessary to truly engender community policing and to build and sustain trusting relationships with the community."

278. The initiative also warned the Saint Louis County and Municipal Police Academy "provides insufficient training hours devoted to community engagement, diversity, and community policing elements during SLCPD basic recruit training.  Of the 916 hours of basic recruit training, only 14 hours are devoted to these topics."

279. As of at least 2016, the SLCPD possessed data indicating the use of force frequency rate was higher for black individuals, as indicated in the November 2020 SLCPD National Justice Database City Report (NJDCR).

280. Blacks were three (3) times more likely to experience SLCPD use of force, as compared to Whites.

281. Blacks accounted for use of force incidents for a total range between 58% to 65%, which significantly exceeded the Black make-up of the county population.

282. The White share of total incidents of use of force ranged from 35% to 41%, below the 67% White share of the county population.

283. Blacks were subjected to the highest and most frequently use of force types: "hand control electronic control device/taser, weaponless strikes/kicks, and chemical irritant."

284. These four (4) use of force types accounted for 89% of all force types used from

from 2016-2018.

285. Use of force involving firearms discharge against a Black individual accounted for more than half the incidents.

286. NJDCR also warned that SLCPD should "adopt a policy requiring Officers to intervene if they see a fellow Officer using excessive force.

287. According to the U.S. Census Bureau, "black males in the Saint Louis region account for 13.2% of the population, but 76.9% of all individuals killed by police from 2013 through 2019.  White males comprised 9.6% of police killings in that period."

### G.  The Saint Louis County Police Department ("SLCPD"), Saint Louis County ("County") & Defendant City Police Department's Notice of Prior Incidents of Excessive Force

288. Upon information and belief, the Saint Louis County Police Department (SLCPD) and defendant County had notice of a 2009 incident, wherein an officer used excessiveforce against Cassandra Fuller.  Ms. Fuller filed suit claiming a white Jennings police officer beat her on her porch after she told a joke.  Ms. Fuller alleged the Officer became angry, tossed her off the porch, forced her to the ground and kicked her in the stomach.   The Jennings police department paid her a confidential amount to settle the case.

289. Upon information and belief, the Jennings Police Department was a municipal department, which defendant County, former SLCPD Chiefs of Police, and defendant Saint Louis County Police Academy either trained and/or oversaw police policy and County operations of.

290. Defendant County and defendant SLPD had notice of a 2009 incident, wherein former Officer Christine Miller, then of the Sunset Hills Police Department, was intoxicated when her vehicle crashed into another car, killing four occupants and seriously injuring a fifth.  Miller was

charged with and subsequently plead guilty to four counts of involuntary manslaughter, in addition to one count of second-degree assault for injuring the fifth vehicle occupant.  Miller was sentenced to eight years in prison.

291. Defendant County and defendant SLCPD had notice of a 2010 incident, wherein former Overland police officer Andrew Ringeisen pushed Ken Hamilton down a flight of steps, causing his death.  Ringeisen was charged with involuntary manslaughter.  He subsequently plead guilty to said charge and was sentenced to three years in prison.

292. Defendant County and defendant SLCPD had notice of a September 2011 incident, wherein Jason Moore was suffering from a psychological disorder when Brian Kaminski, a Ferguson (Saint Louis County), Missouri police officer, repeatedly tased him.  Kaminski's partner, Officer Michael White, arrived and allegedly held Moore while Kaminski continued tasing him. Moore later died of a heart attack.  Moore's family sued in Federal Court and later settled for $3 million dollars. 4:14–c *Moore v. City of Ferguson*, 213 F. Supp. 3d 1138, (E.D. Mo. 2016)

293. Defendant County and defendant SLCPD had notice of a 2015 incident, wherein a Wellston police officer shot and killed Saint Louis County resident, Thomas Allen Jr.  Allen attempted to drive off in a vehicle with a child sitting the back seat.  The Officer jumped in the passenger seat and eventually fired three bullets into Allen and killing him.  Allen was not armed. The officer did not use any less deadly methods of response.

294. Defendant County and defendant SLCPD had notice of a 2016 incident, Christopher Miles died in a fiery car crash after a SLCPD police vehicle chased the car Miles was a passenger in.  Officers negligently chased the car on the wrong way of the road, in violation of department policy that prohibits pursuits unless officers believe someone has committed a violent felony. Miles's family later settled a wrongful death lawsuit for $400,000.

295. Defendant County and defendant SLCPD had notice of a 2018 incident, wherein a

Brentwood Police Officer broke a woman's wrist while detaining her during a search of her home. The City of Brentwood later settled for $13,000.

296. Nearly all of the above-referenced incidents involved more than one officer at the scene and in each of those incidents, the non-participating officers failed to intervene in the unconstitutional use of force against handcuffed, non-resisting and/or unarmed individuals.

297. Upon information and belief, the County, County Board, Mayor and City Council received notice of each lawsuit filed against the defendants.

298. Upon information and belief, all monetary settlements approved by respective Cities must be approved by the County, County Board, Mayor and City Council.

299. Upon information and belief, defendant Chiefs of Police reported to defendant County, Mayor and/or defendant City Police Departments, each instance of officer misconduct and in accordance with the same.

300. Whether the above referenced settlements were settled on a County or City level, defendant County, SLCPD, Saint Louis County Police Academy and/or respective defendant City Police Departments failed to implement adequate use of force and de-escalation policies and remain the moving force behind Plaintiff's injuries, as evidenced by the subsequent paragraph.

301. In July of 2020, Velda City Officers Christopher Gage and Matthew initiated a traffic stop of a car with expired tags, according to Prosecutor's records. The Officers attempted to search the vehicle without probable cause. Officer Schanz falsely reported over his radio that the driver of the vehicle tried to run the Officers over. Officer Schanz walked out into the middle of the street and fired his weapon into the car before and as the car was driving by him. The driver suffered serious physical injury. Both Officers have been charged with First Degree Assault, a Class A felony.

### H.  Defendant Officer's Knowing and Intentional Excessive Force Actions Were Objectively Unreasonable Under The Fourth Amendment & Their Conduct So Clearly Violated The United States Constitution.

302. The Fourth Amendment to the United States Constitution prohibits the use of excessive force during the seizure of a free citizen. *Graham v. Connor*, 490 U.S. 386, 388, 109S.Ct. 1865, 104 L.Ed.2d 443 (1989).

303. Defendant Officers are only entitled to a "qualified immunity" defense if they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known."

304. Upon information and belief, it is clearly established that a "non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers." *De Boise v. Taser Intern., Inc.*, 760 F.3d 892, 987 (8th Cir.2014), citing *Brown v. City of Golden Valley*, 574 F.3d at 499-500 (2009).

305. Plaintiff would have also had a clearly established right to be from the use of a firearm against him, as defendant's firearms and rifle presented a greater risk of excessive or deadly force than a taser, or force capable of causing serious physical injury.

306. In this case, Plaintiff was not violent, resisting or fleeing immediately before and/or during the volley of gunfire defendants engaged in, which caused Plaintiff serious physical injuries.

307. Plaintiff denies the allegation that he fired any shots at defendant Officer Bowersox during the foot pursuit.

308. However, even if the allegation were true, defendant Bowersox would have only been justified in shooting at Plaintiff at the time Bowersox alleged "shots fired" by Plaintiff during the foot pursuit, assuming Plaintiff actually did fire a weapon.  Bowersox claims he did not discharge his firearm at Plaintiff until after other Officers arrived at the scene.

309. Defendant Bowersox, and Officers Wiggs and Dulaney ("defendant shooters"), who

both arrived after the alleged "shots fired" and subsequently discharged their weapons at Plaintiff, were not objectively reasonable when they assumed Plaintiff was in possession of a weapon, in the dark, at least 80 feet away from the closest Officer, over 400 feet away from a firearm allegedly used by Plaintiff, and while Plaintiff was not actively presenting an immediate threat, shooting at any Officers, or in physical possession of any weapons.

310. Defendant shooters used excessive force when they engaged in a "quick succession" of shooting at Plaintiff.

311. In Jackson, the Court of Appeals denied summary judgement and found there was a genuine issue of material fact regarding excessive force where there was a "quick succession of tasings and a dispute as to whether Jackson was resisting the officers or posing a threat at the time of the second tasing." Jackson v. Stair, 944 F.3d 704 (8th Cir. 2019).

312. Defendant shooters failed to assess whether or not there was a "punctuated interim of compliance" before subjecting Plaintiff to a volley of gunshots, knowing Plaintiff was not presenting an active and immediate deadly threat.

313. Upon information and belief, the police investigation in connection to the shooting confirmed there was no evidence establishing Plaintiff was actively firing a weapon or was physically in possession of a firearm that created an immediate threat, precisely at the time defendant Officers fired upon Plaintiff.

314. Upon information and belief, defendant Officers claimed Plaintiff was not complying as he was already being shot at continuously.  Logically, Plaintiff would not have had time to remain still and "comply" if multiple bullets were causing him to suffer pain and move.

315. As analyzed by the Court in Jackson, Plaintiff "did not have time to react with compliance or continued resistance" before or during any of the gunshots Plaintiff was subjected to.

316. Defendant shooter's bullets also provoked Plaintiff's physical position once Plaintiff was stationary inside the creek, either by causing Plaintiff to fear being wrongfully fired upon, or causing Plaintiff to move while being struck by said bullets.

317. A question of fact exists regarding whether the shooting of Plaintiff was objectively reasonable under the circumstances, including, but not limited to the unreliability of multiple statements given by defendant Officers at the scene and during subsequent formal investigatory interviews, evidence recovered, location of each Officer at the time of Plaintiff's shooting, distance between the Plaintiff and defendant Officers at the time of Plaintiff's shooting, the distance between the Plaintiff and alleged used firearm at the time of Plaintiff's shooting, and the fact that Plaintiff was unarmed at the time of his shooting.

318. According to defendant Bowersox's initial statement given to investigators at the scene of the shooting, Plaintiff fired "shots" at Bowersox during a foot pursuit.

319. However, a civilian witness who observed the foot pursuit through the Drury Inn parking lot, was interviewed by investigators and never said she saw a gun in Plaintiff's hand(s) or shooting at Bowersox.  However, the witness did inform investigators "I seen where the police was at when he (referring to Bowersox) shot."  "He (Bowersox) was like over there by the salt, cause immediately after he (Bowersox) shot, he came back."  The witness stated, in sum and substance, that Bowersox was still in the parking lot when she heard a single shot.

320. Plaintiff is ultimately alleged to have fired one single shot.  Even if the allegation of Plaintiff firing one shot were true, there was no continuous threat of deadly force by Plaintiff.

321. The alleged single shot fired by Plaintiff was reported to dispatch at 11:42:26 p.m. From 11:42:26 to 11:44:45, nearly three minutes later, there were no reported shots fired, allegedly by Plaintiff.  In other words, there was no continuous alleged deadly threat, allegedly posed by Plaintiff.  Nevertheless, the totality of circumstances and evidence establish that Plaintiff fired no

shots.

322.    At 11:42:26, Bowersox reported to dispatch "additional shots fired."  As the allegation was that Plaintiff only fired one shot, Plaintiff could not have fired the additional shots. Therefore, the additional shots were actually fired by defendant Officer shooters.

323.    Contrary to the civilian witness's account, Officer Stanze (Bowersox's partner) originally stated during his on-scene interview with investigators that he heard a single shot after he lost sight of both the Plaintiff and Bowersox when they were no longer running through the parking lot.  Stanze also stated, in sum and substance, that he heard two more gunshots, which were not fired by Plaintiff because Plaintiff was only alleged to have fired a single shot.  Stanze added he heard more gunshots afterwards.  Stanze indicated his distance from the Plaintiff was approximately 50-60 yards, which made Plaintiff "barely visible" due to the overgrown brush.

324.    In his subsequent formal interview with investigators, Stanze made several statements, including there was "no light in the creek," he "doesn't know who was shooting," "couldn't see him," "didn't hear any commands" given to Plaintiff by Bowersox during the pursuit and that Plaintiff had "no gun."

325. Bowesrox engaged in the excessive use of force when he discharged at least fifteen (15) rounds at Plaintiff.

326. During his on-scene interview with investigators, Bowersox stated, in sum and substance, that once he lost sight of Plaintiff, he heard a single gunshot originating from the South of the creek, at which point he yelled "shots fired."  He stated he was "unable to see the suspect," even with a flashlight.  Bowersox indicated he was unsure of the other Officer's locations in his specific area.

327. Upon information and belief, Bowersox stated he "observed the suspect look directly at him along with extending his right arm out directly toward his location.  At that point, he claims

he observed a firearm in Plaintiff's right hand.  He claimed the barrel of the firearm was pointing directly at him.  He described the firearm as a "bazooka" pointing at him.  Clearly, Bowersox was intentionally dishonest with investigators, as the alleged firearm used was over 424 feet from Plaintiff and Plaintiff was not in possession of any firearms at the time he was shot multiple times.

328. Bowersox claimed he heard a single gunshot from the area of the suspect.  He said there was a "short pause," then heard numerous consecutive gunshots.  Bowersox did not state he heard any Officers giving Plaintiff any commands between the police volley of shots.  Even though Bowersox had already told investigators he could not see where any Officers were, he claimed he then began shooting at Plaintiff because he "believed the suspect was shooting at responding Officers."

329. Defendant Bowersox's use of deadly force was objectively unreasonable.  Defendant Bowersox's reckless and deliberate fabrication of Plaintiff possessing a gun and actively shooting at Officers and/or himself, was an obvious attempt to justify his use of excessive force and a deliberate indifference to Plaintiff and his Constitutional right to remain free from excessive use of force. Logically, Plaintiff could not be shooting a gun that was located over four hundred (400) feet away from Plaintiff.

330. Wiggs engaged in the excessive use of force when he discharged at least five shots at Plaintiff.

331. Upon his arrival on the scene, defendant Officer Wiggs heard "multiple gunshot being fired in rapid succession."  He was unaware of who was shooting or where the shots were coming from and could only advise the investigators "on-scene" that the gunshots originated from inside the creek or within close proximity.  He then observed Bowersox pointing and shooting his firearm at Plaintiff's direction in the creek.

332. Wiggs indicated he heard a "multiple succession of shots."

333. Specifically, Wiggs reported he first observed Bowersox already shooting at Plaintiff, while Plaintiff's back was facing Bowersox.  Conversely, Bowersox claimed the Plaintiff was facing him when Bowersox began shooting at Plaintiff.  Wiggs also advised the area Plaintiff was in contained overgrown vegetation and prevented full visibility of Plaintiff.  Nevertheless, Wiggs claimed he saw Plaintiff holding and pointing what "he believed to black firearm."  At that time, Wiggs never alleged Plaintiff was actively shooting at him or any other Officers, precisely when Plaintiff was subjected to a volley of shots.  Wiggs also stated he then began shooting at Plaintiff because he feared Plaintiff would "continue to shoot at police officers."

334. Yet, at the beginning his formal interview with investigators approximately one month later, Wiggs claimed he definitely saw Plaintiff with a gun in his hand and pointing said gun at Officers on the other side of the creek.

335. However, towards the end of his formal interview, Wiggs then stated "I didn't know there were Officers on the other side."  He also indicated that prior to the shooting of Plaintiff, he heard no commands given to Plaintiff."

336. Even more outrageous, defendant Wiggs then finally stated, "honestly, I couldn't see anything in his hand."

337. Defendant Wiggs's use of deadly force was objectively unreasonable.  His reckless and deliberate fabrication of Plaintiff possessing a gun and actively shooting at Officers and/or himself, was an obvious attempt to justify his use of excessive force and a deliberate indifference to Plaintiff and his Constitutional right to remain free from excessive use of force.  Logically, Plaintiff could not be shooting a gun that was located over four hundred (400) feet away from Plaintiff.

338. Defendant Officer Dulaney engaged in the excessive use of force when he discharged at least twenty-two (22) shots at Plaintiff.

339. Upon his arrival at the scene, Dulaney advised investigating officers at the scene, that

50

he heard one gunshot.  As it was alleged Plaintiff had already fired one shot before Dulaney's arrival,

the first shot Dulaney heard must have been fired by an Officer.  After the first shot, Dulaney advised

there was a pause, then a second gunshot.  These were additional shots by officers.

340. At no point in time during his on-scene interview, did Dulaney state he saw any of those

gunshots coming from Plaintiff, or that he actually saw Plaintiff holding a gun at that time.

Nevertheless, Dulaney raised his rifle and pointed it towards the middle of the creek.  He stated he

could not see the physical locations of any other officers.  Dulaney recklessly assumed Plaintiff was

"actively exchanging gunfire with police officers" and began discharging his rifle at Plaintiff.  He

then continued to shoot multiple rounds at Plaintiff with his Tactical AR-15 rifle.

341. During his subsequent formal investigatory interview, Dulaney was unable to state

which arm Plaintiff was allegedly holding up, if at all.  He also "could not visually see locations of

other Officers," and the creek was not "illuminated."  Therefore, he had no reason to believe any

other officers were in danger.

342. Defendant Dulaney's use of deadly force was objectively unreasonable.  Defendant

Dulaney's reckless and deliberate fabrication of Plaintiff possessing a gun and actively shooting at

Officers and/or himself, was an obvious attempt to justify his use of excessive force and a deliberate

indifference to Plaintiff and his Constitutional right to remain free from excessive use of force.

Logically, Plaintiff could not be shooting a gun that was located over four hundred (400) feet away

from Plaintiff.

343. In addition to the actions and investigatory representations of defendants Bowersox,

Wiggs and Dulaney, the inconsistent statements, as well as the actions/inactions of multiple

additional Officers, present material issues of fact and support Plaintiff's claim of excessive force.

344. Bowersox claimed Plaintiff raised his "left" arm, while defendant Lang claimed

Plaintiff raised his "right" arm.

345. Yet, Defendant Mueler stated the creek was "void of light" and "could not say which hand concealed and which hand was visible."

346. Defendant Karl advised "visibility of suspect was restricted due to overgrown vegetation in the creek."  He also stated the Plaintiff "put his hands up after being shot."

347. Upon information and belief, defendant Lang stated he had a "clear view of suspect running" and never indicated he observed Plaintiff with a gun in his hand(s).  He further stated "I can't quite see his hands, but I haven't heard any shots."

348. Upon information and belief, Lang was close enough to hear if Plaintiff actually fired a shot.  Plaintiff did not.  While maintaining a "clear view" of Plaintiff, Lang also stated he never saw a "flash of light" coming from Plaintiff's location at any time.

349. Perhaps even more compelling, Lang was asked by investigating officers at Lang's formal interview, "what was your decision not to shoot, when did you make that decision", during which Lang was present with his department Attorney.

350. Officer Lang responded, "can you guys give me a sec, can I talk to him (Lang's Attorney) real quick."

351. Upon answering, Lang responded "I did not fire because I did not see a gun."

352. And in reference to Officers Bowersox, Wiggs and Dulaney (defendant shooters), Lang stated "I am not going to panic fire."

353. Defendant shooters clearly engaged in "contagious shooting," as each officer fired their weapons without assessing whether or not Plaintiff actually posed an immediate deadly threat.  At the time defendant shooters fired at Plaintiff, Plaintiff was not in possession of a weapon, nor was he located in a position in which a reasonable officer would believe Plaintiff was an immediate threat.

354. Upon information and belief, none of the Officers who shot at Plaintiff were clearly able to see Plaintiff or confirm he was armed and actively shooting.  In fact, some Officers even

believed there was more than one suspect in the creek, which was never the case.

355. Upon information and belief, Officers can be heard on their dashcam video stating "they got one down back of the Drury creek and the other running. Don't know if he is in the creek or not." "They got'em both. They just put out, they got'em both." "One's gotta be hit down the back. The other one has gotta possibly be over there." "Which I am running up and six shots went off fast, so I don't know if it was us or them, but they were definitely popping off."

356. Even after the shooting of Plaintiff, defendant Saint Louis Police Department (SLCPD) Investigating Officer, Timothy Anderer, executed an affidavit, to which he understood that false statements were punishable by law.

357. Within said affidavit, Anderer represented that "defendant (Plaintiff) discharged a firearm twice in the direction of two separate officers (Bowersox/Stanze) attempting to cause serious physical injury to the officers." This affidavit was executed after the incident, yet was still contrary to the allegation of Plaintiff discharging one shot. The affidavit was subsequently used to prosecute Plaintiff criminally.

358. Also, Bowersox never specifically stated he saw Plaintiff fire a single shot at him. Bowersox reported he lost sight of Plaintiff during the foot pursuit, then allegedly heard a single shot.

359. Furthermore, Stanze never accused Plaintiff of firing a separate shot at him. Stanze officially reported he heard a single shot after both Bowersox and the Plaintiff were out of site.

360. Defendant SLCPD's and defendant Officer's fabricated account of the shooting of Plaintiff further illustrates the continued deliberate indifference to Plaintiff's constitutional rights.

**Count I– 42 U.S.C. §1983 – Fourth Amendment Violations (Excessive Force)**

*Plaintiff v. Bowersox, Wiggs, Dulaney ("defendant shooting officers"), Stanze, Mueler, Lang, Karl, Vargas, DeVorss* ("defendant non-shooting officers"), Chief Spiess, Chief Schaeffler, Chief Belmar and Chief Fitch ("Chiefs"), *Individually and in Their Official Capacities*

361. Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

362. The conduct by the officers identified in this count and described herein constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, and clearly established law.

363. At all material times, Defendants Bowersox, Wiggs, Dulaney, Stanze, Mueler, Lang, Karl, Vargas, DeVorss, Chief Spiess, Chief Schaeffler, Chief Belmar and Chief Fitch (hereinafter, "defendant Officers") were each acting under color of state law, as agents Saint Louis County, and within the scope of their employment and authority as duly-certified law enforcement officers for the Saint Louis County Police Department, Brentwood Police Department, and Richmond Heights Police Department.

364. At all times material hereto, Defendant Officers directly participated in violating Plaintiff's federal rights.  Defendant Officers are therefore liable in their individual.

365. At all material times, Bowersox, Wiggs and Dulaney recklessly assumed Plaintiff was armed and posing an active and immediate deadly threat.

366. At all material times, Bowersox, Wiggs and Dulaney did not have an actual or reasonable fear of imminent bodily harm when they discharged their weapons at Plaintiff, nor did they have a clear and informed belief that any other person was in danger of imminent deadly danger from Plaintiff.

367. A reasonable officer would have known that using deadly force against an individual is excessive, unnecessary and violates the Fourth Amendment when 1.) officers can't physically

establish a clear visual of the individual, 2.) officers can't determine if the individual is physically in possession of a firearm or deadly weapon, 3.) the individual is between 80 to 168 feet from the closest Officer, 4.) the individual was not actively shooting a firearm at officers, 5.) officers have the ability to take cover, 6.) officers can first de-escalate.

368. The use of force applied by defendant Bowersox, Wiggs and Dulaney by shooting Plaintiff multiple times was objectively unreasonable and violated clearly established law.

369. It was objectively unreasonable for Bowersox, Wiggs and Dulaney to fire upon Plaintiff without properly assessing whether or not Plaintiff was an immediate and deadly threat to them.

370. As a result of Bowersox, Wiggs and Dulaney's unjustified, excessive, illegal, and deadly use of force, Mr. Cockrell experienced conscious pain and suffering.

371. As a result of Bowersox, Wiggs, and Dulaney's unjustified, excessive, illegal, deadly use of force, Mr. Cockrell sustained serious physical injuries, including but not limited to a significantly reduced ability to have children, a left subtrochanteric femur fracture, scrotal gunshot wound, left testicle amputation, right testicle gunshot wound, fracture to left hand, gunshot wound to left thigh and to left hip.  Plaintiff also suffers from constant nerve damage and loss of strength in his hand, significant pain when attempting to walk for a very short period of time, requiring the use of a cane and significant pain when attempting to sit.  Plaintiff can no longer run, jump or play any sports.

372. In addition to these uses of unjustified, excessive, illegal, and deadly uses  of force, each of the Defendant Officers had a duty to intervene on behalf of a citizen whose constitutional rights were being violated in their presence by another officer.

373. Defendant Officers were all aware that the force being used was excessive and unreasonable under the circumstances.

374. Defendants Officers each observed and were positioned to intervene and stop

Defendant Bowersox, Wiggs and Dulaney's use of constitutionally unreasonable deadly force against Mr. Cockrell.

**375.** At no point in time, specifically at the moment Officers discharged their weapons at Plaintiff, did any of the defendant Officers have a reasonable fear of imminent bodily harm, or belief that any other person was in danger of imminent bodily danger from Mr. Cockrell's location at any point in time.

376. Defendants Officer's failure to intervene in each other's collective use of constitutionally unreasonable deadly force violated Mr. Cockrell's clearly established Fourth Amendment rights.

377. As a result of the collective failure to intervene defendant Officers, Mr. Cockrell experienced conscious pain and suffering and serious physical injury.

378. As a direct and proximate result of the acts and omissions described herein, Mr. Cockrell suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

379. Punitive damages are available against defendant Officers and are hereby claimed as a matter of federal common law under _Smith v. Wade_, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements or the differing standard of proof set forth in Missouri Statute § 510.261.

380. Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

381. The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Missouri Statute Section 356.171, subdivision 1.

**Count II – 42 U.S.C. §1983 – *MONELL LIABILITY***
**Municpalities Are Liable For Promulgating Unconstitutional Policies Or**
**Practices That Precipitated Officer Misconduct**
*Plaintiff v. Saint Louis County, Saint Louis County Police Department,*
*Brentwood Police Department, Richmond Heights Police Department &*
*Clayton Police Department*

382. Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

383.   The Saint Louis County Charter, Article I, provides:

a. Section 1.030. "The county shall have all powers possible for a county to have under the constitution and laws of Missouri as fully and completely as though they were specifically enumerated in this charter. These powers shall include, but shall not be restricted to or by, the following: all powers now or hereafter given by the constitution or by law to this county, to any county of whatever class, whether or not St. Louis County be includable therein, or to any county court, county officer, county office, agency or department and all other powers not expressly prohibited by the constitution, by law or by this charter; and all powers necessary and proper to carry into execution any other power. All powers shall be carried into execution as provided by this charter or by law, but if no such provision is made then by ordinance.

b. Section 1.040. The powers of the county under this charter shall be construed liberally in favor of the county, and the specific mention of particular powers in this charter or in any law shall not be construed as limiting in any way the general powers stated in this article."

384. The Saint Louis County Charter, Article IV provides:

    a.  Section 4.270. 1. "The board of police commissioners shall be in charge the department of police. The board shall have the following powers and duties: (1) to formulate policies governing the operation and conduct of the department of police; (2) to appoint as superintendent of police a person qualified and experienced in police administration and law enforcement, and to remove such superintendent by vote of a majority of the entire board; provided, however, that the superintendent shall first be presented with a written statement of the reasons therefor, and shall have the privilege of a public hearing if he so requests; (3) to hear and determine appeals from the decisions of the superintendent of police on disciplinary matters arising within the department; (4) to formulate standards for observance by police departments of municipalities of the county, in order to secure deputization of their personnel by the superintendent; (5) to promulgate, upon recommendation of the superintendent of police a manual of rules and regulations for the qualifications, conduct and discipline of personnel of the department of police, and its operation; (6) to hear and determine appeals from citizens from decisions of the superintendent regarding their complaints; (7) to have such other powers and duties with respect to police administration and law enforcement as the council may by ordinance provide."

385. The County's Mayors, City Councils and/or Boards, Saint Louis Police Department (SLCPD) Chiefs of Police and/or Chiefs of Police for the Brentwood Police Department (BPD), Richmond Heights Police Department (RHPD) and Clayton Police Department (CPD) had final policymaking authority with regard to establishing written policies and training programs governing theconduct of SLCPD, BPD, RHPD and CPD officers performing policing functions on behalf of the

said County and City defendants.

386. The County's Mayors, City Councils and/or Boards, Saint Louis Police Department (SLCPD) Chiefs of Police and/or Chiefs of Police for the Brentwood Police Department (BPD), Richmond Heights Police Department (RHPD) and Clayton Police Department (CPD) established and/or approved of SLCPD, BPD, RHPD and CPD's written policies and training governing the conduct of SLCPD, BPD, RHPD, and CPD officers performing policing functions.

387. The written policies and training established and/or approved by the County's Mayors, City Councils and/or Boards, and Chiefs of Police constitute the official policy of the defendant Cities and were the moving force behind and caused Plaintiff's injuries.

388. The County and defendant County and City Police Departments, acting by and through its Mayors, City Councils and/or Boards, and Chiefs of Police and/or other policymakers, had knowledge of SLCPD, BPD, RHPD and CPD's unconstitutional patterns and practices and knowledge that the samegave rise to a risk of violations of citizens' federal rights.

389. The County and defendant County and City Police Departments, acting by and through its Mayors, City Councils and/or Boards, and Chiefs of Police and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from SLCPD, BPD, RHPD, and CPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

390. On or prior to November 20, 2018, Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD, with deliberate indifference to therights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted,or ratified a number of customs, patterns, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to the handcuffing and restraint process.

391. On or prior to November 20, 2018 Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton, CPD, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by SLCPD, BPD, RHPD and CPD officers.

392. On or prior to November 20, 2018, Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered or ratified a number of customs, patterns, or practices that condoned and required officers to treat the members of the Black Community of Saint Louis County, City of Brentwood, City of Richmond Heights and City of Clayton differently, including but not limited to implementing deadly force at a higher rate against Black men who did not pose a deadly threat to officers.

393. On or prior to November 20, 2018, Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton, CPD with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

394. Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employee officers within Saint Louis County, despite knowledge of their repeated unconstitutional, unlawful, or other improper conduct.

395. Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD had the power to terminate or appropriately discipline County wide departmental Officers for their misconduct prior to November 20, 2018, but failed to do so despite the County and City police department's knowledge of a pattern of complaints regarding excessive force.

396. Prior to November 20, 2018, by refusing to implement adequate termination policies, Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD caused all defendant Officers and to act with impunity and without fear of retribution.

397. SLCPD's failure to terminate or properly discipline Officers that are part of the SLCPD and are assigned to specific local police departments, in general, is part of its larger custom, police, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged defendant Officers to continue engaging in unlawful acts towards arrestees, including Plaintiff.

398. On or prior to November 20, 2018, Saint Louis County, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified its agents, including Chiefs of Police Spiess, Schaeffler, Murphy, Belmar and Fitch, providing improper and harmful training to officers.

399. Saint Louis County, Defendant Cities and Defendant Police Departments had the power to terminate or appropriately discipline Chiefs of Police Spiess, Schaeffler, Murphy, Belmar and Fitch prior to November 20, 2018, but failed to do so despite the County's and City Defendant's knowledge of these Chief's perpetuation of dangerous ideology to officers, or failure to implement adequate policing policies to prevent known risks to individuals within the County.

400. By refusing to terminate or discipline Chiefs of Police Spiess, Schaeffler, Murphy, Belmar and Fitch prior to November 20, 2018, or denounce their ideologies and inaction, defendant Saint Louis County, Saint Louis County Police Department, Defendant City Police Departments and Defendant Cities, caused officers to act with impunity and without fear of retribution.

401. The unconstitutional policies, practices, and customs defined herein were the moving force behind Plaintiff's serious injuries.

402. Plaintiff was seriously injured as a direct and proximate result of the acts and omissions by Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD.

403. As a direct and proximate result of the acts and omissions described herein, Plaintiff suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

404. Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

405. The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Missouri Statute Section 356.171, subdivision 1.

### Count III – 42 U.S.C. §1983 – *Canton Liability (Failure To Train)*
*Plaintiff v. Saint Louis County, City of Brentwood, City of Brentwood Police Department, City of Richmond Heights, City of Richmond Heights Police Department, City of Clayton & City of Clayton Police Department*

406. Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully fully pleaded herein.

407. Saint Louis County, SLCPD, City of Brentwood, City of Brentwood Police Department, City of Richmond Heights, City of Richmond Heights Police Department, City of Clayton, and City of Clayton Police Department failed to properly train or modify its training to Defendant Officers and its other officers, including but not limited to, matters related to the reasonable and appropriate use of force during such arrests, and intervention in the excessive use of force by fellow officers.

408. Effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation with which Saint Louis County Police Department law enforcement

officers and other agents encounter on a regular basis. As such, Saint Louis County, City of Brentwood, Brentwood Police Department (BPD), City of Richmond Heights, Richmond Heights Police Department (RHPD), City of Clayton and Clayton Police Department (CPD) were aware of a need for more and different training.

409. Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD specifically knew that its officers needed training regarding the use of deadly force and the discharging of a firearm/rifle and was required to provide its officers with such training.

410. Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD also specifically knew that its officers needed specific training on the de-escalation and duty to intervene.

411. With deliberate indifference to the rights of citizens, Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD failed to provide adequate training to its officers on de-escalation and duty to intervene.

412. Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD was aware that deprivation of the constitutional rights ofcitizens was likely to result from its lack of training and the failure to modify its training.

413. As such, Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD were deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

414. The failure to train and/or to appropriately modify training constitutedofficial Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD policies, practices, or customs.

415. Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights,

RHPD, City of Clayton and CPD failure to train and/or to modify training was behind the actsand omissions the Defendant Officers made toward Plaintiff.

416. As a direct and proximate result of Saint Louis County, SLCPD, City of Brentwood, BPD, City of Richmond Heights, RHPD, City of Clayton and CPD's acts and omissions, Mr. Cockrell suffered serious physical injuries and experienced pain and suffering.

417. As a direct and proximate result of the acts and omissions described herein, Mr. Cockrell suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

418. Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

419. The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Missouri Statute Section 356.171, subdivision 1.

**PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL ISSUES OF FACT HEREIN.**

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff, prays for judgment against Defendants as follows:

1. As to Count I, a money judgment against all Defendant Officers, Sergeants and Chiefs,  for compensatory, special, and punitive damages and punitive damages together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

2. As to Count II, a money judgment against all defendant Mayors, Defendant Saint Louis County, Saint Louis County Police Department, Saint Louis County Police Academy, City

of Brentwood, Brentwood Police Department, City of Richmond Heights, Richmond Heights Police Department, City of Clayton and Clayton Police Department, for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

3.      As to Count III, a money judgment against Defendant Mayors, Defendant Saint Louis County, Saint Louis County Police Department, City of Brentwood, Brentwood Police Department, City of Richmond Heights, Richmond Heights Police Department, City of Clayton and Clayton Police Department for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

4.      For the appointment of a receiver or similar authority to ensure that the Saint Louis County Police Department, Saint Louis County Police Academy, City of Brentwood, Brentwood Police Department, City of Richmond Heights, Richmond Heights Police Department, City of Clayton and Clayton Police Department properly train and supervise all County and City Police Department Officers.

5.      For such other and further relief as this Court deems just and equitable.

**SANTANA LAW PARTNERS**

Dated: October 18, 2021            /s/
                                   Jaime Santana
                                   Admitted in Eastern District of Missouri
                                   655 Madison Avenue – 5th Floor
                                   New York, N.Y. 10022
                                   Tel:  (212) 448-0055
                                   Fax: (646) 349-2185
                                   E-mail: jaime@santanalawpartners.com

                                   *Attorneys for Trey Cockrell*